UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH M., | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION |
| | )    NO. 18-40167-TSH |
| | ) |
| | ) |
| BECKER COLLEGE, | ) |
| Defendants. | ) |
| | ) |

MEMORANDUM OF DECISION AND ORDER
March 31, 2021

HILLMAN, D.J.

Background

Joseph M. ("Joseph") has filed claims against Becker College ("Becker") for violation of

the Americans With Disabilities Act, 42 U.S.C. § 12189 ("ADA") (Count I); and violation of

Section 504 the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504" or "Rehabilitation Act")

(Count II) as the result of his expulsion from the school for verbal abuse, violent or endangering

behavior and personal conduct. This Memorandum and Order of Decision addresses: (1)

Plaintiff's Motion for Summary Judgment (Docket No. 28); (2) Defendant Becker College's

Cross-Motion For Summary Judgment (Docket No. 38); and (3) Defendant Becker College's

Motion to Strike Portions of Plaintiff's Memorandum in Support or Motion for Summary

Judgment and Local Rule 56.1 Statement (Docket No. 46). For the reasons set forth below, the

motion to strike is *granted,* in part*,* and otherwise *denied.*   Plaintiff 's motion for summary

judgment is *denied* and Defendants' motion for summary judgment is *granted*.

## THE MOTION TO STRIKE

Becker seeks to strike all or part of paragraphs 1, 11 and 13 of Plaintiff's Statement of

Facts and the portions of Plaintiff's supporting memorandum that contains numerous asserted

facts which were not included in his statement of facts and/or as to which he has not cited record

support. I agree that Plaintiff's memorandum includes numerous citations to facts which were

not included in his statement of facts, do not cite to record evidence or cite to record evidence

which does not support his claims. Plaintiff admits that many of the factual assertions contained

in his memorandum are not included in his statement of facts but contends that his memorandum

contains the proper citations to the record. He also admits that on several occasions he miscited

to the record evidence which allegedly supports his assertions and attempts to remedy his

mistake in his response. Moreover, when Defendant points out that an entire section of Plaintiff's

memorandum relies on facts not contained in his statement of facts, Plaintiff's response is that

Defendant's assertion is "too vague and overbroad to require a response."

I agree with the Defendant that Plaintiff has failed to comply with the requirements of

LR, D.Mass. 56.1 in that: *many* of the factual assertions contained in Plaintiff's supporting

memorandum are not cited in his statement of facts, he fails to cite record support for numerous

factual averments, and he mischaracterizes or miscites to record evidence on numerous

occasions. While I appreciate the efforts put forth by the Defendant in connection with this

motion, it would be inefficient and a waste of this Court's resources to parse through the

Plaintiff's submissions and dissect every factual averment when even if they are considered, the

2

Plaintiff is not entitled to summary judgment. At the same time, the Court cannot allow the Plaintiff's deficiencies to go unaddressed. Therefore, the Court will *grant* Defendant's motion to the extent that it will not consider factual averments that have no support in the record, and those factual averments that miscite or mischaracterize the record evidence.

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'" *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a

genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted).   The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.*   (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted). "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

## **Facts**[1]

### Becker College

Becker is a private institution of higher education that maintains a campus in Worcester, Massachusetts. Becker has a variety of academic and social services that it provides to its services. The ACES program is a semester-long academic coaching program. Students in the program are assigned an academic coach and meet periodically with the coach to review their academic progress and receive academic support. The ACES program is open to all students of Becker, not just those with disabilities. The ACES program is part of Becker's "Collaborative Learning Center," which is a department of Becker that provides academic support to all students.

---

[1] Plaintiff has filed a response to Defendants' statement of material facts. On numerous occasions, he has simply denied factual assertions made by Defendant without citing to any evidence in the record to support his denial. In such instances, I have accepted Defendant's asserted facts as true.

Becker also has a Counseling Center, (the "Center") available to all students which provides free confidential counseling services and programs. The Center also provides referrals to professional counseling and mental health service providers in the local area upon request. The Center provides information about its services to students, parents and other members of the Becker community through on-campus outreach programs, presentations during annual student and parent orientations, and publications including Becker's Student Handbook—which is published and accessible to students and parents via Becker's forward-facing website—and Becker's website. The Center provides its services to each student at the student's request. Parents may contact the Center for a consultation or to arrange an evaluation or meeting for their child. A student's participation in services provided by the Center is always voluntary.

Becker's Disability Services Department ("Disability Services") is separate From the Center. Unlike the Disability Services Department, the Center does not provide academic accommodations, and Disability Services does not evaluate, provide, or approve students to receive services provided by the Center. Indeed, the Student Handbook states that students with "a documented learning disability" should contact Disability Services, whereas students "with physical and/or psychological disabilities" may contact the Director of Counseling or the Director of Health Services to assist with meeting accommodation needs.

Becker also provides support to its residential students. Each of Becker's residence halls has two live-in staff positions that provide oversight of students and activities in the residence halls: Resident Assistants ("RAs") and Area Coordinators ("ACs"). RAs are Becker students who supervise other students living in their assigned residence hall. RAs facilitate floor meetings, monitor compliance with rules, and implement dorm programs. ACs are full-time,

5

live-in professionals who hold an advanced degree, oversee the day-to-day management of the residence halls and supervise the RAs. ACs also serve as campus hearing officers who adjudicate reported violations of student conduct rules. ACs are on-call 24 hours a day on Becker's campuses to respond to issues in the residence halls and to the needs of residential students. Students who live in residence halls can report conduct issues, disputes, interpersonal problems, rule violations, and other issues concerning students, visitors, and life in residence halls to ACs, RAs, College Administrator and Campus Police. Reported complaints and/or incidents between students are documented.   Becker informs students and parents about residence hall rules and the duties and availability of Campus Police, Administrators, RAs and ACs, including the 24 hour on call availability of ACs, to respond and address issues concerning resident students through presentations during student and parent orientations, publications through the Student Handbook and website, as well as floor meetings with students in residence halls and postings on residence hall bulletin boards.

<u>Joseph's Enrollment at Becker</u>

Joseph enrolled to attend Becker as a freshman undergraduate student in the Fall of 2017. On June 12, 2017, Joseph's father ("Mr. M."), emailed Mary Lou Roberts ("Ms. Roberts"), Becker's Director of Student Support Services and 504/Disability Coordinator, and asked to schedule a meeting to discuss disability-related accommodations at Becker for Joseph. Ms. Roberts oversaw Becker's Disability Services, and in that capacity was responsible for meeting with students and parents, reviewing documentation submitted in support of academic accommodation requests, and approving and putting in place accommodations for students who request them.

6

Ms. Roberts scheduled a meeting with Joseph and his parents and requested that Joseph's father bring copies of any neuropsychological or psychological testing and a copy of Joseph's high school "504 plan"[2] to the meeting. Ms. Roberts met with Joseph and his parents on July 10, 2017. At the meeting, Joseph and his parents submitted two documents to Ms. Roberts: Joseph's high school 504 plan and a letter dated June 16, 2017 from Joseph's neurologist, Jennifer Cope, M.D. Joseph and his parents never submitted any other documentation to Ms. Roberts regarding accommodations for him.

Joseph's 504 plan indicated that he had Asperger's Syndrome[3], that the condition substantially limited the major life activity of "learning, which adversely affects appropriate participation in academic activities," and recommended that Joseph receive academic accommodations at his high school, including extended time on tests. The letter from Dr. Cope stated that Joseph "should be allowed to have extended time on tests and to take tests in a quiet room." Neither the 504 plan nor Dr. Cope's letter identified or requested any accommodations other than academic accommodations. Ms. Roberts provided Joseph all the academic accommodations requested— namely, extended time on tests and allowance to take tests in a quiet room—for all his courses. During the meeting, Joseph's parents expressed to Ms. Roberts that they were concerned that because of his Asperger's, Joseph was vulnerable to bullying and teasing. Ms. Roberts responded that she had a lot or experience with students who had been diagnosed with Asperger's[4]. Ms. Roberts recommended the Center to Joseph and his parents as a

---

[2] A Section 504 plan documents the services and accommodations that a school will provide for an eligible student pursuant to Section 504.

[3] Plaintiff has stated that he suffers from "Asperger's Syndrome," which is now more commonly referred to as "Autism Spectrum Disorder."

[4] Ms. Roberts denies that Joseph's parents mentioned anything to her about his vulnerability to bullying and teasing or his social awkwardness. For purposes of this Order, I have accepted Joseph's assertion that this

resource to help Joseph with any emotional issues. Neither Joseph nor his parents ever contacted the Director of the Center and there is no record of Joseph or his parents contacting the Center itself to obtain information about services offered by it, or to request a meeting, evaluation, or services of any kind. Additionally, neither Joseph nor his parents requested any specific accommodations to assist him with any social or emotional challenges or otherwise integrating himself within the Becker community.

Following the July 10th meeting, Joseph's mother ("Mrs. M.") visited Becker's website and read about the ACES program. Ms. Roberts, in her capacity as Director of Student Support Services, oversees the program. Joseph enrolled in the ACES program and in August 2017, Kelsey Briggs ("Ms. Briggs") was assigned to be his ACES coach. Ms. Briggs was Becker's Associate Director of Residence Life and Student Conduct. Her job responsibilities included case management of student conduct matters, which meant that she received all incoming student conduct reports and determined who the report would be assigned to for adjudication. Ms. Briggs' role as an ACES coach was a "side position," separate from her regular job duties. Ms. Briggs first ACES meeting with Joseph was on August 30, 2017. Joseph missed his second ACES meeting, scheduled for September 6. On September 7, Joseph met with Ms. Briggs, and it was brought to her attention that to date, for all of his courses, he had either missed or turned in late every assignment. Ms. Briggs met with Joseph the following week, on September 12th, and found that Joseph was still missing assignments in all his classes.

Ms. Roberts emailed Joseph on September 11 and Joseph's father on September 13 and informed them that she was concerned about Joseph's academic performance. More specifically,

_____

conversation took place.

Ms. Roberts expressed a concern that Joseph may not be academically or emotionally ready for the challenges of attending college at this time.   Rather than respond to Ms. Robert's email, Mr. M. called Ms. Briggs later that day and left a her a voicemail. Ms. Briggs returned Mr. M.'s call that same day and they talked about Joseph's deficient academic performance and progress in his classes[5]. Mr. M. never said anything to Ms. Briggs about Joseph being subjected to bullying behavior. Joseph responded to Ms. Roberts' by email on September 13th and told her that he was working with Ms. Briggs, his academic coach, and was "aware of the importance of keeping consistency with academics." Joseph did not mention anything about bullying or social relations with other students in his email to Ms. Roberts.

On September 21 and 22, Ms. Briggs communicated with Mr. M. via email regarding Joseph's academic performance and progress in his classes.   Ms. Roberts was copied on the first email dated September 21.   Mr. M. did not respond to either Ms. Briggs or Ms. Roberts regarding his academic performance, nor did he contact either of them regarding any issues relating to Joseph being bullied or his social relations with other students,

Mr. M. has memorialized in a journal that on September 22, 2017, he went to Becker alone "because of the academic problems of [Joseph.]" He did not call to arrange an appointment beforehand and was not able to meet with anyone. Joseph never told Ms. Briggs that his father

---

[5] Joseph's statement of facts assert that Mr. M. called both Ms. Roberts and Ms. Briggs back the day he received the email and *neither ever called him back.*   He cites the deposition of Mrs. M. as support for this statement. Given Ms. Brigg's detailed notes summarizing an hour-long telephone conversation that she had with Mr. M. on September 13th, the Court will not accept citation to the deposition of a third party to suggest otherwise.   Moreover, Mr. M. has filed an affidavit in support of Plaintiff's opposition to Becker's motion for summary judgment *in which he acknowledges having spoken to Ms. Briggs.* The Court will further address Mr. M's affidavit later in this opinion.

wanted to participate in any of Joseph's ACES meetings with her and never made arrangements for his father to participate in a meeting. Mr. M. never indicated to Ms. Briggs that he wanted to participate in any of Joseph's ACES meetings.

The Events Leading to Joseph's Expulsion

On September 27, 2017, Ms. Briggs received a student misconduct incident report submitted by a cafeteria worker concerning Joseph. She received this report in her capacity as Associate Director of Residence Life and Student Conduct. The cafeteria worker reported that on September 27th, a female minority student, referred to herein as "Nelly," received threats from Joseph. When Becker staff spoke with Nelly, she reported that that there was a prank she was involved in where it was suggested that Joseph's Playstation 4 was sold. It was reported that in response to the prank, Joseph called Nelly a "Black bitch," and said that he would punch her. Nelly reported that these comments made her feel unsafe and uncomfortable. Joseph admits that he referred to Nelly as a "Black bitch." Ms. Briggs spoke with Joseph about this report on September 29th. She told him that what he had said to Nelly was inappropriate and encouraged him to apologize to Nelly.

A week later, Joseph was involved in another incident concerning Nelly where he was reported to have engaged in verbally abusive and threatening conduct. As reported by individuals who were present at the time, on October 4, 2017, Joseph was in a common area of the dormitory using his PlayStation 4 when he became involved an argument with Nelly after Nelly told Joseph he was "racist." Nelly asked Joseph "[w]hat makes me a Black bitch?," and Joseph replied "you act black." When Nelly asked Joseph "[w]hat does not mean?," Joseph replied, "sassy, rude, and loud." A male student in the common area, referred to herein as "Pio" then told Joseph he should

10

"stop talking and leave the room." Joseph became angry at Pio, and started yelling at him. Joseph then "started talking about how [Nelly] won't accept his apology." When a student suggested that Nelly would not accept Joseph's apology because he "said something racist," Joseph became upset and "trie[d] to explain how he isn't racist." Joseph then moved the lobby couch in front of the common area door, and when other students, including Pio, attempted to calm Joseph down, he threatened to fight them. Joseph was making comments such as, "You wanna go? You wanna go?" and, "I don't care who I fight." Other students attempted to calm Joseph down and explain to him that Pio was "trying to help [Joseph] get out of the situation" after he had heard Joseph tell Nelly that she "act[s] Black" because she is "sassy, rude, and loud." Some students left to get Joseph's RA. When the RA arrived, Joseph accused him of "not being in the hall enough. The RA explained to Joseph that he (i.e., the RA) is also student who has classes, and that there are other resources for residents to reach out to if they have problems when he is not around to address the issue.

After Joseph's RA arrived, Joseph said about Nelly: "Let's see what happens when she jokes with the wrong person. Let's just see if she jokes with a guy holding a gun on her." The RA subsequently left to call the campus police, and Nelly also called the campus police. Joseph told other students in the common area he "didn't think anyone is taking him seriously," and that he was "so close to getting a can of gasoline and spraying it all over your rooms."   Joseph then went to his room, and residents heard him banging on something. According to Joseph, he kicked a trash can and punched a thick window. Joseph's conduct scared students in his dormitory, and multiple students—including Nelly—left campus because they were frightened by his conduct.

The campus police reported that when they arrived at Joseph's room and questioned him, he told them that "tension ha[d] originated from previous encounters with [Nelly] where [Joseph] said he made comments that [Nelly] interpreted as racist." Joseph also stated that he "gets 'super angry sometimes' because he feels the other students don't believe him when he says he isn't racist." The campus police reported that Joseph "admitted to 'flipping out' and 'banging walls,' and threatening to 'pour gasoline on the doors and to burn [it].'" They also reported that Nelly told them that during a past incident, "[Joseph] called her a 'black bitch' which sparked the whole issue." After speaking with the campus police, Joseph agreed to leave the dormitory for a voluntary psychological transport evaluation at UMass University Hospital ("UMASS").

Joseph was discharged from UMASS the next day and his discharge instructions indicated that he had he had denied any thoughts of harming himself or others.   He was medically and psychiatrically cleared, and the report indicated that his symptoms appear to have been triggered by conflicts with his peers and stressors at school.

<u>Joseph's Disciplinary Proceedings</u>

Becker maintains and enforces a student code of conduct in its Student Handbook. Per the student code of conduct, students assume an obligation to conduct themselves in a manner compatible with Becker's function as an educational institution and suitable to members of the Becker community. The code of conduct provides that Becker may at any time exclude a student or impose disciplinary sanctions, including dismissal, on a student for violations of the student code of conduct. The behaviors and actions prohibited by the student code of conduct include "violent or endangering behavior" and "verbal abuse." The code states that "[s]tudents are advised to expect severe penalties for disciplinary infractions that involve violent behavior."

12

Becker considers a charge that a student engaged in violent and endangering behavior to be of the highest level of severity.

The Student Handbook also sets forth the student conduct hearing process. Becker provides information about its student code of conduct and the student conduct process and proceedings to students, parents and other members of the Becker community through presentations during annual student and parent orientations and through publications. Becker's Student Handbook is publicly available via the school's forward-facing website and Becker's website. Per Becker policy as set forth in the Student Handbook, students involved in a discipline hearing can have an advisor present at a hearing to assist the student before the hearing in preparing a statement, reviewing the process, and seeking answers to any questions that the student may have— the advisor may not speak during the hearing. Also, per Becker policy as set forth in the Student Handbook, family members are not permitted to be advisors.

Following the October 4, 2017 incident, Joseph was suspended pending a student conduct hearing. His case was directed to the Director of Residence Life and Student Conduct Joseph Lomastro ("Mr. Lomastro"), who was assigned to be his hearing officer. Sometime before October 10, 2017, Mr. Lomastro spoke over the phone with Mr. M. to schedule a disciplinary hearing for Joseph based on the October 4th incident. During their conversation, Mr. M. indicated that he would be coming with Joseph to the hearing. Given the seriousness of the charges, despite him being a family member, Mr. Lomastro agreed to permit Mr. M. to attend the hearing as an advisor. During their conversation, Mr. M. indicated that he wanted Joseph's hearing be held as soon as possible. Mr. Lomastro set October 11, 2017 as the date for the hearing, and Mr. M. accepted that date and has admitted that he had no issue with meeting on

13

that date. After speaking with Mr. M., Mr. Lomastro sent a notice letter to Joseph informing Joseph of his hearing date on October 11, and notifying Joseph of allegations that on October 4, 2017, he had violated provisions of Becker's Student Handbook including, *inter alia*, subjecting others to verbal abuse and engaging in violent or endangering behavior.

Joseph's student conduct hearing was held on October 11, 2017 as scheduled. Joseph and his father were in attendance, Mr. Lomastro was in attendance as the hearing officer, and Ms. Briggs was in attendance as a witness and notetaker. Pursuant to Becker policy, Mr. Lomastro began the hearing by outlining the process regarding how the hearing would proceed, including by addressing Mr. M.'s role as an advisor in the hearing process. Following this introduction, and pursuant to Becker policy, Mr. Lomastro reviewed the allegations against Joseph by reading the Campus Police Report and RA report aloud to Joseph and his father. After he reviewed each report with Joseph and his father, Mr. Lomastro gave Joseph the opportunity to add any information or ask any questions. Joseph added information in attempt to explain his behavior, including by stating that he called Nelly a "Black bitch" to "show how angry [he] was," and that he did not mean the "Black" in "Black bitch" to be in reference to color, and that he was upset about Nelly asking him to be a stripper at her birthday party in part because it was against his religion as a Christian. In addition, Joseph answered questions that Mr. Lomastro asked about the allegations. For example, Joseph stated that he had said he "wished" that he could pour gasoline on other student's doors, not that he actually would. Although Pio and others were trying to help him by removing him from the situation so he wouldn't get into more trouble, Joseph felt they were bullying him. When asked how he would handle himself if a similar situation came up

14

again, *i.e.* someone angered him, Joseph said he would leave the room. The information Joseph added was clear to Mr. Lomastro.

Prior to ending the hearing, Mr. Lomastro and Ms. Briggs left the room and gave Joseph and his father an opportunity to speak privately and for Joseph to take a break before he (Joseph) delivered his response and closing statement. Mr. M. did not speak with Joseph during the break. When Mr. Lomastro and Ms. Briggs returned to the room, Mr. Lomastro asked Joseph and his father if they were ready to continue and they indicated that they were ready. When the hearing recommenced, Joseph took the opportunity make a closing statement on his own behalf. In addition, Mr. M. requested permission to speak on Joseph's behalf which Mr. Lomastro permitted. During his statement, Mr. M. did not deny that Joseph engaged in the conduct that gave rise to the allegations. Instead, he apologized and asked Joseph to be given a "second chance."   Joseph's student conduct hearing lasted more than an hour, which is approximately twice as long as such hearings generally last.   Neither Joseph nor his father requested additional time to present information to Mr. Lomastro during the hearing or any time thereafter. Nothing in the way Joseph conducted himself during the hearing put Mr. Lomastro on notice that he required any accommodation to meaningfully participate in the process. At no time before or during the hearing did Joseph or his father claim that Joseph had been bullied by other students.

By a letter dated October 12, 2017, Mr. Lomastro informed Joseph that he found him responsible for violating Becker policies outlined in the Student Handbook regarding verbal abuse, violent or endangering behavior, and personal conduct, and notified him that he was being dismissed from Becker. The letter notified Joseph of his right to appeal. Joseph failed to file a timely appeal, however, Becker allowed him to submit his appeal late. In his appeal letter,

15

Joseph asserted that Becker's decision was inconsistent with existing Becker policy and procedure, and the information was insufficient to warrant the action. More specifically, Joseph asserted that he was "given very little time to discuss the teasing, bullying and harassment [he] experienced at the hands of other students," and was not "able to give a complete explanation as to how [his] behavior was a result of pent-up frustration, [] which was further exacerbated by [his] disability." Joseph further asserted that his dismissal was unwarranted because he was "unable to deliver this crucial information" and also because he believed his punishment was "unnecessarily harsh" given that it was his first violation of Becker's code of student conduct-- he suggested that he should be placed on probation rather than dismissed.[6]

By a letter dated October 12, 2017 from Francis E. Millerick, Becker's Interim Vice President for Student Affairs/Director of Athletics, Joseph's appeal was dismissed and his dismissal from Becker was upheld. In considering Joseph's appeal, Mr. Millerick reviewed Becker policies as well as the information presented in Joseph's written appeal and documents associated with his case and conduct meeting. Mr. Millerick found that Mr. Lomastro's decision and the sanction applied were consistent with Becker policies and were both based solely on Joseph's conduct. Mr. Millerick noted that Becker's Student Handbook "clearly states zero

---

[6] In his affidavit submitted after the filings of the cross-motions for summary judgment, Mr. M. asserts that prior to the hearing he asked if he could have someone help explain things to Joseph during the proceedings, but the request was denied. He also asserts that he requested that Joseph be permitted to read the conduct report prior to the hearing because it was difficult for him to process information presented to him verbally. He asserts that all these requests were denied. However, the record is clear that Joseph never indicated at the hearing he had difficulty comprehending the substance of the reports read to him by Mr. Lomastro and neither Joseph nor his father asked to read the reports at the hearing. Moreover, neither Joseph nor Mr. M. requested additional time to discuss what had occurred during the proceedings after the break ended, or before making a closing statement. Additionally, Joseph did not assert in his appeal that he was unable to present his case because he was not given copies of the written reports to review before or during the hearing, because he was not permitted to have someone present to explain things to him or because he was unable to discuss the hearing with his father during a break in the proceedings. Given that there is no corroboration in the record, Mr. M.'s belated self-serving assertions will not be considered.

tolerance for the conduct for which [Joseph] was found responsible." Further, Mr. Millerick

found that Mr. Lomastro provided Joseph with ample time to state his case, and in addition,

upheld Mr. Lomastro's conclusion that a disability does not excuse unacceptable behavior.

<u>Joseph's Post-Expulsion Allegations</u>

In connection with the prosecution of this case, Joseph has testified regarding a number

of instances where he felt he was being bullied prior to the October 4th incident:

> a. Sometime between the first and second week of September, Joseph walked into
> a common area of his dormitory without wearing a shirt because the weather was
> warm. "Some teens . . . along with Nelly" "teased some jokes" about Joseph not
> wearing a shirt by making "some cat calls about flexing a muscle or two or
> something."
>
> b. Two upper classmen were "horsing around," and "having some fun," and
> "accidentally locked [Joseph] out of [his] room."
>
> c. An acquaintance found Joseph's socks in the garbage.
>
> d. Students in Joseph's dormitory asked Joseph to "strip" for Nelly's birthday
> party (Joseph admits that the students were joking.)
>
> e. Joseph put a Post-It note saying "do not touch" on property and left it in a
> common area. When Joseph came back, the Post-It note had been removed and
> the property had been taken. Joseph later recovered the property.
>
> f. Students, including Nelly, played a "prank" on Joseph where they took a picture
> of Joseph's Playstation 4, put it on Facebook, and pretended to sell Joseph's
> Playstation 4 on Facebook.

Joseph admits that the only one of these incidents that he specifically recalls bringing to

Mr. Lomastro's attention at his hearing was the "stripper incident."   While Joseph attended

Becker, Ms. Roberts never received any information from him, his parents, or anyone else

indicating that Joseph felt he had been subjected to bullying or teasing behavior. Ms. Roberts did

not attend Joseph's student conduct disciplinary hearing in October 2017 and was not involved in Joseph's disciplinary process.

## Discussion

The ADA, which was enacted to protect disabled individuals, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. Under the ADA, an educational institution such as Becker is required to make "reasonable modifications," for a disabled student unless it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35/130(b)(7). Similarly, the Rehabilitation Act recognizes that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as … education." 29 U.S.C. § 701. To combat such discrimination, Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794(a). Practically speaking, this requires federal funded academic institutions to make "academic adjustments" including "modifications to … academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating" and may require that certain rules be suspended for handicap students where application of such rules would "have the effect of limiting the participation of handicapped students in [such institution's program or activity." 34 C.F.R. § 104.44; 45 C.F.R. § 84.44. While both the ADA and the Rehabilitation Act protect the

rights of the disabled, it is axiomatic that the ADA and the Rehabilitation Act permit an institution to discipline a student even where such misconduct can be attributed to the student's disability. *Tylicki v. St. Onge*, 297 F. App'x 65, 67 (2ᵈ Cir. 2008); *see also Halpern v. Wake Forest Univ. Health Scis.,* 669 F.3d 454, 465 (4ᵗʰ Cir. 2012) (law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability).

Generally, courts construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability. In the context of a student excluded from an educational program, to prove a violation of either the ADA or Rehabilitation Act, the plaintiff must establish that: (1) he is disabled, (2) he is otherwise qualified to participate in the defendant's program, and (3) defendant excluded him from its program based on his disability. *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1ˢᵗ Cir. 2000)*.* As to the third element, there are three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See Nunes v. Massachusetts Dep't of Correction*, 766 F.3d 136, 144–45 (1ˢᵗ Cir. 2014). In this case, Plaintiff has asserted claims against Becker based on disparate treatment and failure to accommodate grounds.

Joseph asserts that he is entitled to summary judgment on his claims under the ADA and Rehabilitation Act because the undisputed facts establish as a matter of law that in dismissing him for his alleged threatening conduct, Becker discriminated against him by treating him differently than it did similarly situated students who didn't suffer from Asperger's, and because

19

Becker was aware of his disability and failed to offer him reasonable accommodations. Joseph also asserts that he is entitled to summary judgment on his claims because Becker failed to engage in good faith in the interactive process.

Defendant asserts that Joseph's motion for summary judgment must be denied and judgment instead entered in its favor because Joseph cannot prevail on his claims as a matter of law as the undisputed fact establish: (1) that his claim under Title III of the ADA fails because he lacks standing to pursue it given that he has not requested injunctive relief (which is the only relief available thereunder) and in any event, is not entitled to such relief; (2) that he was not "otherwise qualified" to attend Becker; (3) that his disparate treatment claim fails because he has not established that the other student did not suffer from Asperger's and the other student was not similarly situated to him; (4) that Becker was not on notice that he required special accommodations, which he has never articulated with any degree of specificity, in the areas of social skills, independent living, and communication; and (5) Becker did not deny him reasonable accommodations in connection with the disciplinary hearing.

<u>Joseph's ADA and Failure to Engage in Interactive Process Claims</u>

Before delving into the more complex issues, the Court will address Defendant's motion for summary judgment on Plaintiff's ADA claim for lack of standing. Plaintiff's opposition does not address Defendant's assertion that his ADA claim fails for lack of standing and at the hearing, he essentially conceded the point. Accordingly, summary judgment shall enter in Defendant's favor on Count I. *See G. v. Fay Sch.,* 931 F.3d 1, 9 (1st Cir. 2019) (Title III authorizes only injunctive relief, not monetary damages, to successful plaintiffs: the enforcement statute for Title III is 42 U.S.C. § 12188, which incorporates the remedies of 42 U.S.C. § 2000a-

3(a), which does not include money damages.). Additionally, Plaintiff's motion summary judgement on his claim that Becker failed in good faith to engage in the interactive process does not require protracted discussion. Becker asserts that this claim must be dismissed because Joseph has failed to cite to any admissible evidence in support thereof. I agree. Plaintiff bases this claim on Mses. Roberts' and Briggs' alleged failure to engage in the interactive process not with the Joseph, but with his father after Ms. Robert's September 13th email. Plaintiff's claim is based on a complete mischaracterization of the interactions between Ms. Roberts, Ms. Briggs and Mr. M. Moreover, Plaintiff's attempt to cure the obvious factual deficiencies and inconsistencies regarding this claim in the affidavit submitted by Mr. M *after* the filing of Defendant's opposition and cross-motion for summary judgment is unavailing. Plaintiffs' motion for summary judgment for failure to engage in the interactive process is summarily denied and judgment shall enter for Becker on this claim.

Rehabilitation Act Claim.

The Rehabilitation Act requires federally funded academic institutions to make "academic adjustments" including "modifications to … academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating" and may require that certain rules be suspended for handicap students where application of such rules would "have the effect of limiting the participation of handicapped students in [such institution's program or activity." 34 C.F.R. § 104.44; 45 C.F.R. § 84.44.[7]  Becker concedes that Joseph has established the first element of his Rehabilitation Act claim, *i.e.*, he suffers from a disability.

---

[7] For purposes of the parties' cross-motions for summary judgment, Becker does not dispute that it subject to the Rehabilitation Act as an academic institution which receives Federal financial assistance.

Becker asserts, however, he cannot establish the second or third elements of his claim, that is, that he was otherwise qualified to participate in its program and was expelled from the program solely by reason of his disability. As to the third element, Becker argues that Joseph's claim fails under both disparate treatment and reasonable accommodation theories.

<u>Whether Joseph was a Qualified Individual</u>

A qualified individual is one "who, with or without reasonable modifications to rules, policies, or practices, … meets the essential eligibility requirements' for participation in a program or activity." 42 U.S.C. § 12131(2). Joseph has the burden to establish he is qualified. In meeting this burden, he must present "sufficient evidence to show (1) that he could satisfy the essential eligibility requirements of the program, *i.e.,* those requirements that bear more than a marginal relationship to the [program] at issue. And (2) if not, whether any reasonable accommodation by the [defendant] would enable the plaintiff to meet these requirements." *Halpern*, 669 F.3d at 462 (internal quotation marks and citation to quoted case omitted). In evaluating the evidence, the Court must consider that [a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap. When determining if a plaintiff is otherwise qualified, it is necessary to consider the extent to which reasonable accommodations that will satisfy the legitimate interests of both the school and the student are (or are not) available and, if such accommodations exist, the extent to which the institution explored those alternatives. Reasonable accommodations are those which do not require a modification of the essential nature of the program or impose an undue burden on the recipient of federal funds." *Shulse on Behalf of Shulse v. W. New England Univ.*, No. 3:19-CV-30146-KAR, 2020 WL 4474274, at *6 (D. Mass. Aug. 4, 2020)(internal citations and internal quotation marks

22

omitted)(quoting *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 22 (1ˢᵗ Cir. 1991) and *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 792 (1ˢᵗ Cir. 1992)).   Moreover, in considering whether the plaintiff is "otherwise qualified" to participate in an academic program, "a certain degree of deference is owed to the judgement of an academic institution, —"   "[a] university is entitled wide discretion in making judgments as to the academic performance of its students, so long as its behavior is not so arbitrary or irrational as to not constitute an exercise of professional judgment." *Id.*, at *6 (internal citation and citation to quoted cases omitted); *see also Halpern,* 669 F.3d at 462.

Becker does not dispute that academically Joseph was qualified to continue at the school. Rather, Becker asserts that Joseph was not otherwise qualified to remain enrolled in its academic program because of his serious violations of its student code of conduct—a part of its program that is an essential eligibility requirement.   Becker also argues that Joseph cannot establish that with reasonable accommodations he could have abided by its student code of conduct because he never requested any accommodations (never mind reasonable accommodations) and, to this day, has not identified any accommodations which would permit him to meet its disciplinary requirements.

Joseph does not dispute that his actions were not only inappropriate but violated the student code of conduct. Given the nature of his conduct, *i.e.,* threatening to pour gasoline on the doors of his doormats and calling a fellow student a "Black Bitch," any attempt to argue that his conduct did not constate "violent or endangering behavior" and "verbal abuse" would be fruitless. Instead, he argues that given the lack of any prior disciplinary record or history of violence, and that he reacted in response to perceived bullying, the punishment was too severe.

23

Becker's determination in this case to dismiss Joseph (a determination which implicates the public's safety) is one to which this Court gives substantial deference.   Accordingly, on this record, I find that Joseph was not otherwise qualified to continue his education at Becker. Nonetheless, for the sake of completeness, I will assume that Joseph was otherwise qualified and address whether he has established that Becker discriminated against him because of his disability.

<u>Whether Plaintiff has Established that Defendant's Action was Discriminatory on Disparate Treatment Grounds</u>

Plaintiff asserts that he has established that he was discriminated against based on a disparate treatment theory because a student that was involved in a more serious incident at Becker involving actual violence was dealt with less harshly than he was for making a threat in the heat of the moment. The gravamen of a disparate treatment claim is that similarly situated comparators were treated differently for the same or similar conduct. First, Joseph has not asserted, and the record evidence does not establish that the individual in question (Joseph refers to him as "Student B") did not suffer from Asperger's and therefore, Student B is not an appropriate comparator. Moreover, the incident which led to Student B's suspension is simply not similar to that which led to Joseph's expulsion: Student B got into a physical altercation with another student and after taking Student B into custody, campus police found that he had a butterfly knife in his possession. Joseph on the other hand, threatened to pour gasoline on the doors of his dormmates (and possibly burn them down) *and* he made disparaging remarks about an African American female student— remarks that had racial undertones. As pointed out by Becker, Joseph's disparate treatment claim fails on other grounds: Joseph's self-serving legal conclusion that the other student's conduct was much more serious (in terms of the threat to

24

himself and others) than his own is not supported by the record, and his legal conclusion that Becker's stated reason for dismissing him from the program was a sham to cover up that it was dismissing him as the result of his disability is speculative and also not supported by any record evidence cited by him.   For these reasons, I find that Joseph's disparate treatment claim fails as a matter of law.

<u>Whether Becker Failed to Provide Joseph with Reasonable Accommodations</u>

Joseph primarily asserts that Becker violated the Rehabilitation Act by failing to agree to the reasonable accommodations he had requested regarding his disciplinary hearing. He also makes a less developed argument that Becker was aware of his disability at the time that he started matriculating there and failed to provide him with reasonable accommodations regarding his deficient social skills, and difficulties with independent living and communication.

It is undisputed that Becker granted all academic accommodations requested by Joseph It is also undisputed that other than requests concerning his disciplinary hearing, Joseph *never* made any express requests for Becker to make any accommodations which were not related to his academic performance. More specifically, he never requested accommodations pertaining to his inability to socialize or communicate with others, or his difficulty in living as an independent adult. Joseph argues that the July 10th meeting with Ms. Roberts his parents, and in particular, his mother, made statements to Ms. Roberts about his being vulnerable and subject to bullying which put Becker on constructive notice of his social deficiencies such that the school should have offered him reasonable accommodations to deal with such deficiencies.

Joseph bears the burden of establishing that Becker was on notice of his disability *and* the limitations it imposes. This is not a situation where the plaintiff's need for accommodations was

obvious. While Becker was aware of Joseph's Asperger's diagnosis, that in and of itself is not sufficient to put Becker on notice that Joseph had difficulties socially interacting and communicating with others. Moreover, even after it became clear that Joseph was having difficulty with his assignments, neither he nor his parents raised any issues regarding his ability to interact socially with other students or generally within the Becker community. Moreover, Becker made Joseph and his parents aware of support systems offered on campus such as the Center—Joseph did not avail himself of these opportunities. Under the circumstances, it was incumbent upon Joseph to ask for any accommodations outside of the academic context. Because Joseph never requested any accommodations regarding his inability to socialize, his claim fails.

Joseph also asserts that Becker violated the Rehabilitation Act by failing to grant him reasonable accommodations he requested during the disciplinary hearing process. More specifically, he asserts that he requested that he be allowed to read all the reports prior to the hearing rather than have them read to him to permit him to better comprehend their content, and they did not allow him to have someone present who could present his case for him. While Becker permitted advisors to accompany a student to disciplinary proceedings, they did not permit the advisors to participate. However, not only was Mr. M. permitted to accompany Joseph, they were permitted to talk to each other during a break regarding any issues they wanted to raise and Mr. M. was permitted to give a closing statement on Joseph's behalf.   Joseph and his father were giving nearly twice as long to present their case than generally provided at such hearings and when asked if they needed additional time, they indicated they did not. Finally, neither Joseph nor his father indicated at the hearing *or in Joseph's appeal*, that Becker's alleged failure to provide his requested accommodations prevented him from adequately presenting his

case. Moreover, Joseph has failed to link Becker's alleged failure to accommodate him to the decision to dismiss him, *i.e.*, he has failed to establish how the outcome would have differed had he been allowed to have his father or someone else play or more active role or been provided an opportunity to read the reports rather than have them read to him, Accordingly, Plaintiff has failed to establish an essential element of his Rehabilitation Act claim: that Becker dismissed him because of his disability. For the reasons set forth above, Becker's motion for summary judgment is granted.

<u>**Conclusion**</u>

It is hereby Ordered that:

(1) Plaintiff's Motion for Summary Judgment (Docket No. 28) is ***denied***;

(2) Defendant Becker Colleges Cross-Motion For Summary Judgment (Docket No. 38) is ***granted***; and

(3) Defendant Becker College's Motion To Strike Portions Of Plaintiff's Memorandum In Support of Motion for Summary Judgment And Local Rule 56.1 Statement (Docket No. 46) is ***granted***, in part, and ***denied***, in part.

Judgment shall enter for the Defendant.

/**s**/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
 **DISTRICT JUDGE**